HIGGINS *v.* McGILL.

1. VENDOR AND PURCHASER — LAND CONTRACTS—EXECUTION—CON-SIDERATION OPEN TO INQUIRY.

In a suit to restrain summary proceedings, to set aside a certain land contract, and for an accounting, where the vendee denied the execution of the contract and also denied the correctness of the consideration expressed therein, the latter was still open to inquiry although she failed to prove that she did not execute the contract; the consideration being always open to inquiry, even where execution is not denied.

2. SAME—CONSIDERATION—ACCOUNTING.

Where plaintiff sustained the burden of proof that the consideration for each of two former contracts was $1,200, and that the consideration in the contract in dispute should be the combined balance owing on the two, she is entitled to an accounting on that basis with credit for all payments satisfactorily shown.

Appeal from Cass; Des Voignes, J. Submitted June 3, 1919. (Docket No. 33.) Decided December 22, 1919. Rehearing denied January 28, 1920.

Bill by Irena Higgins against William McGill to enjoin summary proceedings, to set aside a land contract, and for an accounting. From the decree rendered, plaintiff appeals. Reversed.

*C. M. Lyle* and *John R. Carr,* for plaintiff.

*Chester E. Cone,* for defendant.

STEERE, J. This bill is filed for an injunction to restrain proceedings at law to dispossess plaintiff of certain premises, to have a certain contract in relation thereto claimed to have been signed by plaintiff declared void, for an accounting and right to redeem.

The immediate moving cause for filing said bill was commencement by defendant, in August, 1917, of summary proceedings to recover from plaintiff possession of 120 acres of land in Calvin township, Cass county, Michigan, to which he held the fee title and claimed ownership, and of which she had been in possession for many years, claiming it as her own. At the time defendant instituted his summary proceedings he held the record title to this farm and amongst other papers an unrecorded contract from himself to plaintiff, purporting to be signed by both parties, dated July 24, 1912, by the terms of which she bought and he sold to her the 120 acres for a stated consideration of $7,159, payable five years after date with interest at 7% per annum payable annually. He claims this was the renewal of a former land contract, dated June 24, 1898, between the same parties and covering the same property, in which the stated consideration was $3,707. She admitted having signed the former, but denied the correctness of its stated consideration, and totally repudiated the latter, asserting she never signed it or had any knowledge of its existence until informed of it later by a little 12-year-old girl, named Augusta, who lived with her and had signed it without her knowledge at defendant's instance. The issues of fact upon which the testimony of the parties is in direct conflict were whether plaintiff had signed or consented to the contract of July, 1912, and the amount owing by her to defendant. The trial court found said contract was executed by plaintiff as defendant claimed, that there was due upon it $9,944.43, on May 1, 1918, that defendant's title was in effect a mortgage lien on plaintiff's farm for enforcement of which he must resort to foreclosure proceedings, and granted an injunction permanently restraining summary proceedings at law to obtain possession.

These parties have had business relations for many

years and are now both past the threescore and ten. Defendant testified he was 75 years of age. Plaintiff, who is an illiterate native of North Carolina, born in slavery, gave her age as 74 years, stated that her "nationality is white, Indian and a little colored descent," and of her educational qualifications admitted:

"I can't read nor write. I don't know any figures or any dates of the month or anything like that. I ain't got no learning; never went to school a day in my life."

Defendant has lived many years in the village of Union, Cass county, about four miles from the farm in question which is in the colored settlement of Calvin township and was settled upon by plaintiff with her family between 45 and 50 years ago. He has been and is a money loaner, a dealer in land, horses and cattle; he acquired extensive real estate holdings and does many thousand dollars of business a year. Plaintiff was manifestly a person of energy and industry in her field of activity which was her farm and home. Her husband, from whom she was separated some 25 years ago and has since died, is not shown to have figured in any of her business transactions during the many years she developed and worked this farm. She testified that she had borne nine children, all brought up on the farm. Five of them who appeared as witnesses for her were of mature ages varying so far as stated from 40 to 56 years. The young girl, Augusta, who said she had lived with plaintiff all her life and called her "mother," is referred to by counsel as a daughter and a foster child.

Plaintiff early bought 80 acres of this farm from one George Redfield on contract and obtained a deed for it from him in 1883. In 1890 she borrowed $1,300 secured by mortgage on the 80 acres from a man named Silver who died in 1892, after which those settling his estate asked payment. She had before

that time become acquainted with defendant in a business way and incurred some indebtedness to him secured by chattel mortgage, apparently on some stock, as in 1890 he gave her written permission to let the bearer have a certain cow and he would allow her $30 on it. When making a payment on a chattel mortgage she spoke to him about borrowing money to pay the Silver mortgage, and was also wishing to get a 40 acres of land which he owned, called the "Dungey forty," which joined her place.

Their first real estate transaction was in relation to this 40 acres which she bought from him on a land contract dated February 29, 1892, for $1,200. In it the consideration is stated to be $1,260, $50 payable on that date and the balance in annual payments of $100 with interest at 8% per annum. They both testified to an agreed consideration of $1,200. When first examined he asserted that she paid nothing down "when she bought it for $1,200." Shown the contract stating a consideration of $1,260 and asked if it should have been $1,200 defendant replied, "Well now, I don't know just about what that was, but there was something that there was $60 put with it, I don't remember just exactly how it was." She testified positively that the agreed price was just $1,200 and she paid the $50 first payment then, and thereafter made payments on it of $100 per year or more. He denied that she paid $50 down, or any such amounts subsequently as she claimed, asserted "she paid but mighty little no time," that he gave her a receipt whenever she made payments and each of them had a duplicate contract.

In January, 1894, plaintiff borrowed $1,200 from defendant to pay off the Silver mortgage. His method of transacting this business was to take from her a deed, dated January 22, 1894, of the 80 acres for a stated consideration of $1,500 and give her a land contract of like date for the same, in which the ex-

pressed consideration was $1,501.38 payable in five years with interest at 8% per annum. It bears five indorsements of payments amounting to $96. Of this plaintiff testified she had paid $100 and interest on the Silver mortgage, leaving $1,200 due, which was just the amount borrowed to pay off the mortgage; that she did not then know she was signing a deed to him of her 80 acres, but let him fix up the papers as he claimed they should be and she signed them for she then had confidence in and "trusted to him what to do," as he said he "wouldn't cheat her quicker than he would his mother." He first testified of this that she borrowed money from him to pay off the mortgage, but he did not remember how much it was, nor when or to whom the money was paid because they made papers, which was what he went by. Recalled as a witness, he said that $1,500 was the amount he paid for her. The mortgage was discharged from the public records by Mary Silver, administratrix, on May 3, 1894.

On May 24, 1898, defendant had a new land contract prepared and signed by both of them which on its face provided for the sale to her of the 120 acres covered by the two previous contracts, the stated consideration being $3,707 payable in three years from date with interest at 7% per annum. On this there are seven indorsements of payments amounting to $200.32. She denies the correctness of the amount stated but says he came with the papers proposing that it would be better to have both pieces of land together, "to make it all in one payment," as to which she agreed with him and signed the paper he produced for that purpose. Of this, defendant first testified the contract bore his signature, that he did not remember how much was then due on the two contracts put together, but he thought about $3,000, that he could not tell where the contract was made or who by, and he

did not "know anything about these transactions except as appears on the papers," and when recalled was positive she then owed him $3,707.

July 24, 1912, defendant had a new contract covering the 120-acre farm drawn up between himself and plaintiff by A. H. Field who was accustomed to do clerical work for him. By its terms he sold the farm to her for $7,159, payable within five years from date with interest at 7%. Accompanied by Field he went to plaintiff's home where she was alone with the little girl Augusta and, as defendant claims, secured plaintiff's signature, or mark, to the instrument, which she emphatically denies. It is not acknowledged and bears no indorsements. On its face it appears as signed by defendant and "Irene (X) Higgins, her mark," witnessed by "A. H. Field, Augusta H. Higgins." Plaintiff testified of this that she was then sick in bed with paralysis and did not then know of McGill and Field being there, did not sign by mark or authorize her name to be written on the paper, and knew nothing about it until the next day when the girl informed her and said they had left a new paper; that as soon as she got able to ride she went to see defendant about it and denied owing him the amount he claimed, as he had once told her she had done extra well and only owed him $200 or $300, saying, "He said I owed him $7,000 or $10,000, or something like that. He said he wouldn't bother with it, and was going right up and put me out of doors. I told him to go on." This interview apparently resulted in an awakening loss of confidence in him on her part and a grievance as she viewed it upon which she was easily aroused to warm discussion and intemperate assertion, as typical of which she declared:

"I will just walk up and down the road before I will pay it. * * * When I know I paid anything I ain't going to pay no more; never allow to pay another cent while I live, and I told him so when he

came there and said if I didn't pay him he would throw me in the road. I told him to go ahead and throw me in the road, and I say so today."

It was testified by her and other members of her family that during the summer of 1912 she had suffered a stroke of paralysis affecting mainly one side, which laid her up for some time, during which two named physicians attended her and she slowly recovered, walking first with crutches and at the time of the trial yet remained somewhat crippled on that side so that she walked with a cane. The girl Augusta testified that when McGill and Field came to the farm plaintiff was "sick in bed suffering with a stroke" and she herself was outdoors; that Mr. McGill, whom she knew, called her and said he had some papers to sign, telling her to write plaintiff's name to them with her mark and sign as a witness, which she did as directed; that the papers were not read to her, and plaintiff "did not have anything to do with the contract at all." McGill, who when first examined said he knew nothing about those transactions except as appears by the papers and monotonously punctuated his testimony with "I don't remember," experienced an active renaissance of memory when recalled, stated plaintiff was up and attending to her work when they went there to have a settlement with her, that Field did the figuring, with which she was satisfied and made her mark to the contract, which he thought was read to her. Field testified that he had acted as clerk for McGill off and on since 1897, drawing many papers for him, as he did many thousands of business in a year, and there was nothing more about this transaction to impress it on his mind than any other and he had "no distinct recollection of drafting this paper in 1898," saying further:

"All I recollect about it is what is stated in the contract, Exhibit G. As to what was said and done I

don't pretend to remember, I figured the amount by the former contracts; interest on them, whatever payments were made, * * * I have no recollections of what took place there that day, except what it takes to complete the paper. That applies to any contract that is made. I know nothing in this contract any different from any other contract that I have made for Mr. McGill."

Thus qualifying his indicated inferential testimony as based on "what it takes to complete such papers," he stated that plaintiff was around the house, was told what the amount was, said she could not write, "a very common occurrence," that he wrote her name with her hand on the pen, presumed he made the mark, that Augusta H. Higgins wrote her own name as a witness, and in a general way confirmed McGill's version of the matter.

Plaintiff does not deny having signed by her mark the various instruments defendant prepared relative to this farm prior to the last contract of 1912, although she denies knowing at the time that one of them was a deed to him of her 80-acre farm. Her testimony that she could not read, write or figure, "trusted to him what to do" and none of these papers were read to her is not denied by defendant, beyond his thought that the last was read to her, or by any other witness. These transactions were in her life rare and unusual events, of magnitude and serious import, vitally affecting her home and all she possessed. She knew by first knowledge what was done and said, but only knew what was written in the papers to which she made her mark as, and to the extent, defendant may have told her.

In his examination relative to the Dungey 40 contract of 1892, on which are indorsed payments amounting to $176.42, defendant stated he could not remember when he bought the 40 or what he paid for it,

207—Mich.—37.

had little recollection of any important deals with plaintiff, although he "had a little deal with her, more or less. She has bought horses of me and I bought one or two of her." Following this he was asked if she borrowed $1,200 of him after February 29, 1892, and said, "Well, she borrowed money to pay the mortgage off"—then was asked and answered as follows:

"*Q.* How much did she borrow?
"*A.* I don't remember.
"*Q.* Was it $1,200?
"*A.* I don't remember. I didn't try to keep those things in my head because we made papers and that is what I go by. * * *
"*Q.* How much did you pay?
"*A.* I don't remember.
"*Q.* And to whom?
"*A.* I don't remember whom it was paid over to.
"*Q.* You don't remember anything about it, do you?
"*A.* Yes, I remember the deal, but I don't remember just whom it was paid over to.
"*Q.* You don't remember the amount?
"*A.* No, sir.
"*Q.* Do you remember who discharged the Osborn Silver mortgage?
"*A.* I don't remember."

When recalled later and asked what he had to say relative to plaintiff's claim of the amount she borrowed, he replied, "I say I paid the whole thing, $1,-500. She gave me a deed of the 80 acres at the time."

It is undisputed the third contract, of 1898, was made to extend and combine her existing indebtedness then represented by the two previous contracts. Plaintiff so understood, but contends it does not correctly represent the amount then owing by her, and that advantage was taken of her inability to read and write by inserting a larger amount. Field identified this contract as in his handwriting. Asked if he remembered when it was made he answered: "Nothing in particular about it. That is my writing, that is all,"

and also said of it later, "I don't remember anything about this contract, nothing particular about it to impress it on my memory."

Fourteen years later defendant took Field with him and went out four miles into the country to plaintiff's home at a time she was there alone with a little girl and obtained, as he claims, a renewal of the former contract by which he agreed to sell her and she agreed to buy this 120-acre farm, then assessed at $2,650 but shown worth $75 per acre at the time of trial, for an expressed consideration of $7,159, claimed to be with its increase her original indebtedness to him, incurred about 25 years before, beginning with $2,400 as claimed by her, and $2,761.53 according to his version. In the meantime his dominant muniments of title to her farm, as party of the first part, provided "that all hay made and crops raised on said land are not to be sold or otherwise disposed of without the written consent of the party of the first part." The evidence is persuasive that he received payment for wheat and other products of the farm which he evasively denies. Plaintiff's denial and repudiation of this instrument was absolute and her refusal to recognize it by further payments positive, whether from honest belief that her indebtedness was fully or mostly paid, or because of surprise at the rate at which money breeds when cultured by a scientific breeder whose business is to "buy and sell horses, and do different kinds of business, and loan money," in connection with which he handles chattel mortgages. Her words and conduct are at least consistent with the theory that if she did make her mark to this paper she did not understand its contents.

Defendant's answer is a denial, asking for no affirmative relief. The trial court held, as was ultimately conceded, that the deed and land contracts defendant held covering plaintiff's farm were but se-

curity for money loaned, in their nature a mortgage lien which could only be enforced by foreclosure, and granted an injunction restraining defendant's summary proceedings, but finding that the last contract, of July 24, 1912, was valid, held that having acquiesced therein by its execution plaintiff's "defense utterly fails because she says the debt had been extinguished at that time, and there would be no occasion to enter into a new renewal contract; what would be her due would be a deed and not a contract." So concluding, the court accepted the consideration nominated in that contract as indisputable and determined her indebtedness to be the amount therein stated with interest from the date of the contract, and as a consequence did not grant an accounting as to the many transactions which preceded it, although the court said of plaintiff's witnesses:

"Counsel for McGill in his brief uses this language: 'None of these witnesses produced on the part of the plaintiff are worthy of credit. They have all except one, possibly, been convicted of crimes. Mr. H. C. Wilson testifies that their reputation for truth and veracity in the neighborhood in which they have long lived is bad and that he would not believe any of them under oath. Mr. Wilson is a colored man himself and very loyal to his people.' * * * An examination of the record discloses the unfortunate history of the family and confirms, I regret to find, what is said in defendant's brief."

From this it is perhaps inferable that the record before us is incomplete. Our scope of inquiry is confined to the authenticated printed record furnished this court for review of the appeal. An examination of it confirms but part of what is said in defendant's brief. The Mr. Wilson there mentioned was the only impeaching witness called by defendant. So far as the record discloses his asserted loyalty to his people cannot be taken seriously. He condemns the char-

acter of all members of the colored race of whom he makes mention, including himself. He testified that he long lived near and knew plaintiff and her family, that he knew the reputation for truth and veracity of six named members of the family who were witnesses, including plaintiff, and it was "bad," adding, "I would not believe Irena Higgins or one of the family under oath." On cross-examination he testified he had been arrested for crime, convicted and sentenced to Ionia, the occasion, as he states, being:

"I throwed some lead at a man kind of careless that time, and he needed it—cost me a thousand dollars, too, but he would have got his bacon if he hadn't went."

The only evidence we discover of loyalty to his people is his account of another criminal experience which cost him $100, based on an event in which he knocked a man, "as far as from here across to that wall there." This he thought was a good investment, as before that the man "wouldn't let a negro eat at his table. After that he was a gentleman." The sweeping statements of defendant's counsel that the witnesses produced on the part of the plaintiff "have all, except one, possibly, been convicted of crime" finds support in this record only as to five of the twelve witnesses called by plaintiff's counsel and sworn. These were her children who testified mainly in confirmation of her claim that she had on certain occasions made specified payments, which defendant denied, when certain of them were present, with details of what products of the farm in crops or stock she sold to get the money and when paid. We find nothing in the record to support this accusation as to the girl Augusta or plaintiff herself, who is not shown to have ever during her long life in that community been arrested for or charged with any criminal offense, to have ever had a lawsuit or employed an attorney before the present litigation;

and Wilson's impeaching evidence as to her reputation
for truth and veracity is met to the contrary by that
of two apparently disinterested citizens of long ac-
quaintance with no disclosed criminal record—color
not shown—one of them being a U. S. mail carrier
whose route passed her home and who had known her
for 40 years.

We cannot agree with the conclusion of the trial
court that having failed to show she did not execute
the contract plaintiff's defense utterly fails.   The tes-
timony of the four witnesses present is equally divided
as to her participating in the transaction.   Assuming
that she did, the undisputed circumstances under which
defendant secured her mark to an instrument of its
character and importance shade its verity and are
persuasive that if her hand was on the pen when Field
made the mark, as he finally concluded and stated
after testifying that he did not pretend to remember
what was done and said or "anything about this con-
tract," she did not hear it read, nor as the matter was
presented to her, execute the instrument with full
knowledge of its contents and import, or clearly un-
derstand that it mortgaged her farm and obligated
her to an amount inserted as the consideration.   But
accepting the conclusion of the trial court that plain-
tiff has failed to sustain the burden of proof in denial
of her mark against the presumptions of the written
instrument, the considerations expressed in such in-
struments where execution is not denied is always
open to inquiry, and particularly so under the cir-
cumstances of this case.

We are impressed that plaintiff has on this record
as it reads convincingly sustained the burden of her
claim that the actual consideration for each of the
first two contracts, of 1892 and 1894, was $1,200, and
that she executed the third understanding and believ-
ing the consideration therefor was the combined bal-

ance owing on the two which preceded it. She is entitled to an accounting on that basis with credit for all payments satisfactorily shown.

These parties were by no means on an equality in business experience and ability. Defendant was a money loaner and trafficker of large experience, doing many thousand dollars of business each year in lines of dealing which demanded keen business ability and shrewdness to succeed, as he did to a marked degree. She was an unlettered colored woman, living in the country with her family on new land she had secured which proved to be productive and by her efforts was made to produce. She for years successfully raised upon it both crops and stock. With an eye to business defendant early formed her acquaintance, secured her confidence, sold her horses, took chattel mortgages from her, sold her additional land at a profit, lent her money, took a deed of her farm and secured in writing control of what she raised upon it. Compared with his, her business transactions were few. Unable to read or write she could only record them in her memory. Whether true or false, she relates the more important business events in her life with a distinctness and verifying circumstantial detail often characteristic of the illiterate, in marked contrast with defendant who in venturing beyond his asserted lack of remembrance and dependence on what is in the contracts is quickly adrift in a maze of contradictions. Failure to have written evidence of their various business transactions is more readily explainable and excusable for one in her walk in life than in his. For a business man dealing with many people, in various lines, with clerical help, doing many thousand dollars of business a year, to keep no books of account, or written records beyond the securities he holds is at least peculiar. What the facts are in defendant's case is open to conjecture. First stating he knew nothing

about these transactions except as appears on the papers and had no independent recollection he later inadvertently stated:

"Oh, I think I have records or accounts of payments that Mrs. Higgins made since she has been transacting business with me since February 29, 1892, but I haven't looked it over. I keep account of different things, you know, and when I get through with that book I lay it away."

If that book which he had laid away, containing records of accounts of plaintiff's payments since February, 1892, had been, or could be, produced it would seem a very helpful thing to one or both of these parties; but defendant shortly thereafter denied its existence and hastened to assert,—

"I haven't any record at all outside of what are indorsed on these contracts. * * * I would not pretend to have a record of it. I don't make any records or minutes when I make loans to different people. I simply rely on the papers of that date."

Asserting that plaintiff "didn't make but mighty little payments," that he remembered "her making little payments once or twice" and he didn't think she "ever made a payment to exceed $20," when shown an indorsement of $100 in his handwriting he did not deny it, but later impeached his few indorsements on "those older contracts" with the reflection that there were some of them "all right and some that are not." He was the only witness for the defense in denial of plaintiff's claimed payments, his only other witnesses being Field and Wilson. His testimony was in substance an omnibus denial, behind dependence on the contracts and asserted non-remembrance, with at times conflicting statements when he ventured into details.

Claiming that throughout all these years plaintiff paid but little on her indebtedness to him and never near kept up the interest, admitting he knew the deed

of her farm and contracts he held were only security for money loaned and to be treated as a mortgage, with the nature of which he was not unfamiliar, he attempted after a difference developed as to the amount plaintiff owed him to short-cut past a possible accounting and right of redemption by summary proceedings to put her off the place. She is entitled to an injunction, as held by the lower court, restraining summary proceedings, and to an accounting, either in this suit or on foreclosure by defendant as to her indebtedness to him which is secured by the deeds and contracts which he holds.

Under the theory on which the decree appealed from was rendered, no accounting was gone into as such and directly passed upon by the trial court. The finding and decree of the trial court that between the original parties the consideration set out in defendant's security in the nature of a mortgage may not be inquired into is set aside and the case remanded for such further proceedings as parties may desire and the trial court determine in harmony with this opinion, with costs of this court to plaintiff.

BIRD, C. J., and MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.

The late Justice OSTRANDER took no part in this decision.